IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EVA NORDIN,                                        No. 3:22-cv-00775-HZ

               Plaintiff(s),            OPINION & ORDER

    v.

THE STANDARD FIRE INSURANCE
COMPANY, a foreign corporation,

               Defendant(s).


Paul H. Krueger
Kymber R. Lattin
Paul Krueger Law Firm PC
4380 S.W. Macadam Avenue
Suite 450
Portland, OR 97239

       Attorneys for Plaintiff

Peder A. Rigsby
Sean Douglas McKean
Bullivant Houser Bailey
One SW Columbia
Suite 800
Portland, OR 97204

       Attorneys for Defendant

HERNÁNDEZ, District Judge:

This matter is before the Court on Defendant The Standard Fire Insurance Company's

Motion for Summary Judgment. ECF 24. For the reasons that follow the Court grants

Defendant's Motion.

## BACKGROUND

Plaintiff Eva Nordin was at all relevant times self-employed as a home appraiser. On

May 3, 2021, Plaintiff was involved in a motor vehicle accident and suffered bodily injuries that

affected her ability to "carry out her usual and customary income-producing activities." Notice of

Removal, ECF 1, Ex. A (Complaint) at ¶ 9. Plaintiff had automobile insurance through

Defendant and asserted a claim under that insurance for personal injury protection ("PIP")

income continuation expense benefits.

On May 3, 2022, Plaintiff filed a complaint in Multnomah County Circuit Court against

Defendant and alleged claims for payment of PIP benefits, breach of the covenant of good faith

and fair dealing, and negligent infliction of emotional distress. On May 27, 2022, Defendant

removed the matter to this Court on the basis of diversity jurisdiction.

On July 3, 2023, Defendant filed a Motion for Summary Judgment. The Court took the

matter under advisement on August 21, 2023.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact

and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The

moving party bears the initial responsibility of informing the court of the basis of its motion, and

identifying those portions of "'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the

absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927–28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support its claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

Defendant moves for summary judgment as to all of Plaintiff's claims. The parties also raise a number of objections to evidence submitted in relation to the Motion for Summary Judgment

### I.    Evidentiary Objections

#### A.    Profit and Loss Statements

Defendant objects to Exhibit 14 to the Declaration of Kymber Lattin, ECF 30, on the grounds that Lattin lacks adequate personal knowledge to authenticate the documents in that

exhibit and/or they contain hearsay. Pages one through six of Exhibit 14 are titled "Monthly Profit and Loss Statements" and pages seven through ten are copies of bank statements with handwritten notes. Defendant notes Plaintiff testified at deposition that the profit and loss statements are not records prepared by Plaintiff in the ordinary course of her business. Rather they were prepared by Plaintiff's previous counsel in response to Defendant's requests for information regarding her income. McKean Decl, ECF 35, ("McKean Decl. II"), Ex. J at 5-6 ("I never do these statements," but Defendant "wanted something more specific, so . . . the [legal] assistant gave me these forms to try to fill in as much as I could. . . . This is not something [I] made."). These documents were not created by Lattin nor was Lattin involved in creating these documents. In addition, the record does not reflect who wrote the notes on the bank statements and Lattin does not indicate that she wrote the notes. According to Defendant, therefore, Lattin lacks the personal knowledge to authenticate the profit and loss statements or the bank account records.

In response to Defendant's objection Plaintiff filed a Declaration, ECF 38, and a copy of the profit and loss statements that include Plaintiff's handwritten notations. Local Rule 56-1(b), however, provides that "[i]f an evidentiary objection is raised by the moving party in its reply memorandum, the non-moving party may file a surreply memorandum . . . addressing only the evidentiary objection; the moving party may not file further briefing on its evidentiary objection." Plaintiff's Declaration and additional evidence, therefore, is not permitted under Local Rule 56-1. Accordingly, the Court declines to consider Plaintiff's Declaration, ECF 38, and the exhibit attached in determining whether the profit and loss statement is properly authenticated.

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Such evidence may include testimony of a witness with knowledge of the document. Fed. R. Evid. 901(b)(1). However, a witness may testify only to a matter on which the witness has personal knowledge. Fed. R. Evid. 602. It is clear that Lattin was not involved in the creation of the profit and loss statements and, therefore, she lacks personal knowledge of how the documents were generated and what information Plaintiff's prior counsel relied on in their production. Lattin, therefore, lacks the requisite personal knowledge required to authenticate the profit and loss statements. Lattin also lacks personal knowledge of the origin of the handwritten notes on the bank statements to authenticate them.

Defendant also asserts that even if the documents in Exhibit 14 were properly authenticated they are inadmissible hearsay without an applicable exception. Defendant contends the documents contain statements regarding Plaintiff's income and expenses that were not made under oath in connection with this matter and that Plaintiff offers to prove her income and expenses with these documents. The only potentially applicable hearsay exception is for records "kept in the course of a regularly conducted activity of a business." Fed. R. Evid. 803(6)(B). As noted, however, the profit and loss statements are not records that Plaintiff kept as a regular activity of her business. In addition, although the bank account records appear to contain some information that may be business records, there is no admissible evidence of the origin of the handwritten notes, or evidence that those notes constitute business records.

Accordingly, the Court declines to consider Exhibit 14 to Lattin's Declaration when evaluating Plaintiff's response to Defendant's Motion for Summary Judgment.

### B.      Plaintiff's Statement Regarding Causation and Recovery

Defendant also objects to Plaintiff's statement in her Declaration that she "did not recover properly from [her] low back surgery as a result of dealing with [her] insurance carrier and now suffer[s] ongoing pain as a result." Pl.'s Decl., ECF 31, at 2. Defendant asserts this is expert testimony within the scope of Federal Rule of Evidence 702 that Plaintiff is not qualified to provide because she has not presented any evidence that she has the "knowledge, skill, experience, training, or education" necessary to qualify her to testify as to a person's recovery from lower back surgery or the impact that "dealing with [her] insurance carrier" may have had on that recovery.

Plaintiff responds that she is competent to testify as to her own bodily condition and that statements made for medical diagnosis or treatment that describe medical history, symptoms, sensations, or their general cause is an exception to the rule against hearsay pursuant to Federal Rule of Evidence 803(4). Specifically, Plaintiff asserts that her statement is "a recitation of statements made by her medical providers." Pl. Rep. to Def.'s Obj., ECF 37, at 3.

The Court agrees that Plaintiff may testify as to her pain and bodily condition. Plaintiff, however, is not competent to testify as to whether she recovered "properly" from back surgery or the medical cause of her alleged failure to properly recover because that is evidence within the scope of Rule 702. In addition, the Ninth Circuit has held that Rule 803(4) does not provide an exception to the hearsay rule for statements that a doctor makes to a patient. *See, e.g., Bulthuis v. Rexall Corp.,* 789 F.2d 1315, 1316 (9th Cir. 1985)("Rule 803(4) applies only to statements made by the patient to the doctor, not the reverse."). *See also Wik v. Shelton*, No. CV. 07-1726-HA, 2009 WL 2163529, at *1 (D. Or. July 17, 2009)("803(4) provides an exception to the hearsay rule for statements made by a patient to a doctor, but not for statements made by a

doctor to a patient."). The fact that Plaintiff's statement is a recitation of statements made by her medical professionals does not except it from the hearsay rule pursuant to Rule 803(4).

Accordingly, the Court will disregard Plaintiff's statement that she "did not recover properly from [her] low back surgery as a result of dealing with my insurance carrier." The Court will not, however, disregard Plaintiff's statement that she suffers ongoing pain.

### C.    Exhibits N and O to McKean Declaration

Plaintiff asserts in her Response to Defendant's Evidentiary Objections that Exhibits N and O to McKean's Declaration in support of Defendant's Reply are inadmissible and should be struck from Defendant's Reply. Specifically, Plaintiff asserts these documents are "correspondence of a compromised offer to resolve the case," and, therefore, they may not be used to prove or disprove the validity or value of a claim pursuant to Federal Rule of Evidence 408.

Defendant responds that the letters in Exhibits N and O were not communications for the purpose of negotiating settlement; Defendant did not offer them to prove the value or invalidity of Plaintiff's claim, but rather to show that Defendant had issued payments at particular times; and, in any event, Defendant produced other evidence of the dates and amount of its payments to Plaintiff.

Because the Court relied on Defendant's other evidence of the dates and amounts of payments to Plaintiff and did not consider Exhibits N and O in its evaluation of Plaintiff's claims, the Court denies Plaintiff's motion to strike Exhibits N and O as moot.

## II.    PIP Payment Claim

Plaintiff asserts Defendant breached the insurance contract when it failed to pay Plaintiff all of the income expense continuation benefits due under her PIP coverage.

The policy provides in relevant part:

> We will pay Oregon Personal Injury Protection [PIP] benefits to an insured who sustains "bodily injury". . . . [PIP] benefits consist of the following:
>
> * * *
>
> 2.    **"Income Continuation Expense":** 70% of the "insured's" loss of income from work during a period of disability provided that:
>
> a.    The "insured" was usually employed at the time of the accident; and
>
> b.    The period of disability continues for at least 14 days.
>
> Income continuation expenses include only expenses for loss of income incurred from the date the disability began to the date on which the "insured" is able to return to his usual occupation. Income continuation expenses will only be paid for a total of 52 weeks of loss of income.

McKean Decl., ECF 26 ("McKean Decl. I"), Ex. I at 19 (emphasis in original). The Limits of Liability section of the policy provides PIP is limited to "$3,000 per month, up to a maximum of 52 weeks, for 'income continuation expenses'" *Id*. at 21.

It is undisputed that Plaintiff satisfied the requirements for income continuation expense benefits from May 3, 2021, through March 28, 2022. The parties, however, dispute the total amount of benefits to which Plaintiff is entitled. Defendant asserts it has paid Plaintiff all of the income continuation expense benefits to which she is entitled. Plaintiff disagrees.

### A.    Contract Interpretation

"[F]ederal court[s], sitting in diversity, appl[y] state law to interpret . . . insurance polic[ies]." *Good George, LLC v. Cincinnati Ins. Co*., No. 3:20-CV-01705-AR, 2022 WL 16984217, at *3 (D. Or. Aug. 23, 2022)(citing *Travelers Prop. Cas. Co. of Am. v. ConocoPhillips Co.,* 546 F.3d 1142, 1145 (9th Cir. 2008)). Under Oregon law, the interpretation

of an insurance policy is a question of law. *Hunters Ridge Condo. Ass'n v. Sherwood Crossing, LLC,* 285 Or. App. 416, 422 (2017)(citing *Hoffman Const. Co. v. Fred S. James & Co.*, 313 Or. 464, 469 (1992)).

"When interpreting insurance policies, Oregon courts 'determine the intention of the parties based on the terms and conditions of the insurance policy.'" *Twigg v. Admiral Ins. Co.*, 324 Or. App. 259, 269 (2023)(quoting *Hoffman Construction Co. v. Fred S. James & Co.*, 313 Or. 464, 469 (1992)). Oregon courts "interpret the policy 'from the perspective of an ordinary purchaser of insurance.'" *Id.* (quoting *Bighorn Logging Corp. v. Truck Ins. Exchange*, 295 Or App 819, 828 (2019)). The court interprets terms that are not defined in the policy "according to their plain meaning." *Id.*(citation omitted). "The court determines whether words have a plain meaning by 'reference to the usual source of ordinary meaning, the dictionary.'" *N. Pac. Mgmt., Inc. v. Liberty Mut. Fire Ins. Co.*, 558 F. Supp. 3d 1097, 1101 (D. Or. 2021)(quoting *Phillips v. State Farm Fire & Cas. Co.*, 302 Or. App. 500, 506 (2020)(defining the term "directly" by reference to Webster's Third New Int'l Dictionary 641 (unabridged ed. 2002)).

"If there is more than one plausible interpretation of an undefined term, [the court] 'examine[s] the word or phrase in the context in which it is used in the policy and the broader context of the policy as a whole.'" *Id.* (quoting *Bighorn Logging,* 295 Or. App. at 828). "If ambiguity or reasonable doubt remains regarding the meaning of a policy word or phrase in the context of the entire policy, that doubt is resolved against the drafter, the insurance company, and in favor of the insured. *Id.* (citation omitted). Ultimately, the policyholder bears the initial burden of establishing coverage. *ZRZ Realty Co. v. Beneficial Fire & Cas. Co.,* 222 Or. App. 453, 465 (2008). If the policyholder satisfies this burden, the insurer then has the burden of establishing an exclusion to coverage. *Id.*

As noted, the policy defines income continuation expense benefits in relevant part as "70% of the 'insured's' loss of income from work during a period of disability" limited to the sum of . . . $3,000 per month, up to a maximum of 52 weeks." McKean Decl. I, Ex. I at 21. The policy does not define "income," nor does it include any statement regarding the general purpose of the income continuation expense. Although the parties do not expressly assert differing definitions of "income," their arguments indicate that Defendant asserts "income" means monthly revenue. Plaintiff's arguments indicate that Plaintiff asserts "income" means revenue less expenses averaged monthly.

The Court interprets terms that are not defined in the policy "according to their plain meaning." The dictionary defines "income" as "a gain or recurrent benefit usually measured in money that derives from capital or labor; the amount of such gain received in a period of time." Webster's Third New Int'l Dictionary https://www.merriam-webster.com/dictionary/income (last visited October 2, 2023). Black's Law Dictionary defines income as "[t]he money or other form of payment that one receives usu. periodically from employment, business, investments, royalties, gifts, and the like." *Income, Black's Law Dictionary* (9th ed. 2009). Neither of these sources' definition of income includes expenses. In fact, Black's Law Dictionary specifically differentiates "income" from "profit" and defines profit as "the excess of revenues over expenditures in a business transaction." *Profit, Black's Law Dictionary* (9th ed. 2009). Similarly, Merriam Webster defines "profit" in relevant part as "the excess of returns over expenditure in a transaction or series of transactions; . . . net income[1] usually for a given period of time." Webster's Third New Int'l Dictionary https://www.merriam-

---

[1] Net income is defined as "the balance of gross income remaining after all allowable deductions and exemptions are taken." Webster's Third New Int'l Dictionary https://www.merriam-webster.com/legal/net%20income (last visited October 2, 2023).

webster.com/dictionary/profit (last visited October 2, 2023). These definitions support Defendant's suggested definition of income as revenue rather than Plaintiff's suggested definition of revenue less expenses.

Plaintiff does not cite any policy provision, definition, or other authority support for her assertion that "income" under the policy should be defined as revenue less expenses. Rather, Plaintiff relies on the fact that during the claims adjustment process Defendant used information from the monthly profit and loss statements provided to it by Plaintiff instead of revenue taken from her business ledger to calculate Plaintiff's monthly income. Plaintiff asserts the profit and loss statements included the expenses from her business from May 3, 2020 through May 2, 2021 and, therefore, Defendant interpreted "income" within the meaning of the income continuation expense benefit provision as revenue minus expenses.

Defendant notes Plaintiff testified at deposition that her business ledger was the most accurate way to determine "how much [Plaintiff] made for appraisals" in a given month. McKean Decl. II, Ex. J at 2. Plaintiff stated that because she was paid for appraisal work at differing times, her bank account records were not an accurate method of determining when she performed work. Specifically, Plaintiff testified it would be "pretty impossible" to "match up deposits [to her bank account] . . . with the days that [she] perform[ed] . . . work" because she was paid for doing appraisals at inconsistent times. *Id.* at 7. Plaintiff's business ledger does not include expenses, rather it lists each appraisal job she performed, how much she charged for the job, and whether and when she was paid. Defendant explains that it did not use the ledger during the claims adjustment process because Plaintiff did not produce her business ledger to Defendant until April 23, 2023, which was after discovery closed in this action. Because Defendant was not aware of Plaintiff's business ledger during the claims adjustment process, it relied on the profit

and loss statements provided by Plaintiff to calculate her income continuation expense benefits. Defendant's use of profit and loss statements under these circumstances do not establish that Defendant interpreted "income" under the policy as revenue less expenses. The Court concludes on this record that the plain meaning of "income" in the context of the income continuation expense benefit is revenue from Plaintiff's appraisals.

Even if the Court concluded "income" in the context of the income continuation expense benefit is revenue less expenses, the Court finds Plaintiff has not submitted admissible evidence to support her alleged expenses. Specifically, the amounts Plaintiff cites as expenses for May 2021 through October 2021 come from the monthly profit and loss statements attached at Exhibit 14 to Lattin's Declaration. The amounts used for expenses for November 2021 through January 2022 appear to come from the handwritten notes on the bank statements attached at Exhibit 14 to Lattin's Declaration. For the reasons noted above, the Court has concluded these documents are inadmissible because they are not properly authenticated and they contain inadmissible hearsay. In addition, even if the bank statements are admissible, Plaintiff has not established that they accurately represent her expenses for November 2021 through January 2022 because Plaintiff testified at deposition that she "pay[s] all [her] business expenses on [her] credit card." McKean Decl. II, Ex. K, at 118. Plaintiff, however, did not submit any of her credit card statements or evidence of her credit card statements. Finally, Plaintiff lists expenses of "$811.72 (avg.)" for both February and March 2022. Pl. Resp., ECF 29, at 21. Plaintiff, however, does not provide any support for that amount, nor is it clear what time period was used to average the expenses of $811.72. Moreover, Plaintiff testified at deposition that "most of [her] main expenses[, such as her real estate license,] are all pretty much at the beginning of the year, . . . January, February, March." McKean Decl. II, Ex. J, at 100. Plaintiff also stated, however, that

her expenses for things such as her real estate license, her business license, training classes, and insurance premiums apply to different periods. For example, some are biannual payments, some are annual payments, and some are quarterly payments. Plaintiff, therefore, has not established that it is reasonable to assume Plaintiff's expenses in any individual month are indicative of her expenses in later months or that averaging payments for some unspecified period of time is a reasonably accurate way to determine expenses. The Court, therefore, concludes that if "income" within the meaning of the income continuation expenses benefit was intended to mean revenue less expenses, even viewing the evidence in the light most favorable to Plaintiff, Plaintiff fails to establish her expenses.

     **B.**    **Amount of Benefits Paid by Defendant**

     Defendant asserts Plaintiff is entitled to $26,132.10 in income continuation expense benefits and that it has paid Plaintiff in full. Plaintiff asserts even if the Court adopts Defendant's method of calculating her benefits, Defendant has paid her only $14,717.54.

     Plaintiff relies on Defendant's PIP ledger attached to Lattin's Declaration to support her assertion. ECF 30, Ex. 6. The PIP ledger relied on by Plaintiff reflects payments to Plaintiff in the amount of $14,717.54 from May 24, 2021 through January 12, 2022. Defendant points out, however, that the PIP ledger relied on by Plaintiff is out of date and notes that the current PIP ledger reflects it paid Plaintiff $2,717.54, on January 13, 2022; $7,917.06, on February 27, 2023; and $799.96, on June 29, 2023, for a total of $26,132.10. Van Nest Decl., ECF 36, ¶ 3, Ex. P. The Court concludes on this record that Defendant has established it has paid Plaintiff $26,132.10 in income continuation expense benefits.

### C.    Defendant's Method Calculation of Benefits

In the two years before the motor vehicle accident Plaintiff reported that her business, Nordin Appraisal Service, had gross income of $85,456 in 2019 and $85,855 in 2020. McKean Decl., Exs. G and H (United States Income Tax Form 1040, Schedule C tax years 2019 and 2020). Drawing all inferences in Plaintiff's favor, Defendant estimated that $85,855 was the annual income[2] that Plaintiff would have earned in 2021 and 2022 if she had not been injured in May 2021. Plaintiff's business ledger indicates she had actual income of $1,700 in May 2021 (after May 3, 2021); $3,875 in June 2021; $3,925 in July 2021; $7,440 in August 2021; $5,770 in September 2021; $3,175 in October 2021; $775 in November 2021; $1,785 in December 2021; $1,550 in January 2022; $3,125 in February 2022; and $2,350 in March 2022. Lattin Decl., Ex. 13. In reaching its total amount of income continuation expense benefits in this action Defendant calculated Plaintiff's lost income for each month during the relevant period by subtracting the actual income Plaintiff reported each month in her business ledger from the estimated monthly earnings of $7,154.59.[3] As noted, however, the policy permits recovery of only 70% of Plaintiff's lost income up to $3,000 per month. Accordingly, Defendant then multiplied each month's lost income by 70% and when that amount was less than $3,000, Defendant paid Plaintiff the actual amount for the month. When the amount was greater than $3,000, Defendant paid Plaintiff $3,000 for the month. Using this method, Defendant calculated Plaintiff's total income continuation expense benefits in the amount of $26,132.10.

---

[2] $85,855 rounds to a monthly gross revenue of $7,154.58. Defendant, however, used $7,154.59 in its calculations of Plaintiff's income continuation expense benefits and Plaintiff does not object to that portion of Defendant's calculations. The Court, therefore, uses the estimated monthly revenue of $7,154.59 in its analysis.

[3] See Exhibit 1 to this Opinion and Order for calculations.

The Court notes that Defendant ended its calculation of Plaintiff's actual income on March 31, 2022, and Plaintiff ended her calculation on March 25, 2022. As a result, Defendant included in Plaintiff's March 2022 income a payment of $575 on March 29, 2022, and a payment of $550 on March 31, 2022, neither of which are included in Plaintiff's calculations. Plaintiff's calculated actual income for March 2022 is, therefore, $1,125 less than that calculated by Defendant. *See* McKean Decl. I, Ex. D at 3. The record reflects Plaintiff's work was impacted by her injuries through March 28, 2022. *Id.,* Ex. F. Defendant, therefore, should not have included payments made after that date in its calculation of Plaintiff's actual income for March 2022. The difference in actual income, however, does not affect the total amount of income continuation expense benefits as calculated by Defendant because using either actual income figure results in a 70% lost revenue figure that exceeds $3,000 for the month of March 2022. Under either actual income figure, therefore, Plaintiff was entitled to only $3,000 for March 2022 and Defendant paid Plaintiff $3,000 for March 2022. Accordingly, Defendant's error is not material.

**D.    Plaintiff's Method of Calculation**

As noted, Plaintiff asserts Defendant's method is improper because Defendant failed to consider Plaintiff's expenses. The Court, however, has already concluded "income" within the meaning of the policy is composed only of Plaintiff's revenue not revenue less expenses or, in the alternative, that Plaintiff failed to establish her requested expenses.

Plaintiff also asserts the method Defendant used to calculate Plaintiff's income in this action is improper because during the claims adjustment process Defendant used a monthly average to calculate Plaintiff's income continuation expense benefits. Plaintiff asserts that Defendant should have continued to do so when calculating Plaintiff's benefits in this litigation.

Under Plaintiff's suggested method, Defendant projected Plaintiff to make $85,855 annually

when she was injured. Plaintiff, therefore, was projected to make $1,651.06 per week if she had

not been injured.[4] Plaintiff was injured for 47 weeks, therefore, her projected annual income

during her period of reduced work was $77,599.71. Plaintiff, however, earned actual income of

$25,416.10 during the relevant 47-week period. The difference between Plaintiff's actual and

projected income based on the weekly method is $52,183.61. Prorated over the 47 weeks of her

injury, the "shortfall" in Plaintiff's weekly income was $1,110.29. In order to calculate a

monthly shortfall, Plaintiff multiplies the $1,110.29 weekly income shortfall by four for a total

monthly income shortfall of $4,441.16, Seventy percent of that figure is $3,108.81. As noted,

Plaintiff's income continuation expense benefits are limited to a maximum of $3,000 per month.

According to Plaintiff's method, therefore, Plaintiff is entitled to income continuation expense

benefits of $3,000 every month for the 11 months that she was injured for a total of $33,000

rather than the $26,132.07 to which Defendant asserts Plaintiff is entitled.

Defendant asserts Plaintiff's method is not supported by the language of the

policy or the record. Specifically, Defendant notes the policy permits Plaintiff to recover "70%

of [her] loss of income from work during a period of disability." The policy, therefore,

contemplates payment for 70% of income actually lost rather than recovery of estimated weekly

income averaged monthly, particularly when, as here, there is a record of Plaintiff's actual

income during the relevant period. In addition, the policy provides a limit of $3,000 per month,

not per four weeks. According to Defendant, therefore, it was required to determine Plaintiff's

actual income per month during the relevant period and Plaintiff is entitled to recover 70% of

---

[4] See Exhibit 2 to the Opinion and Order for calculations.

that actual lost income per month up to $3,000. Plaintiff does not point to any language in the policy that supports calculating average weekly income and multiplying that by four.

Defendant explains that it used an average monthly income calculation method during the claims adjustment process because it was not aware of Plaintiff's business ledger in which she specifically tracked her business income by date. As noted, Plaintiff did not produce her business ledger to Defendant until after the close of discovery. At deposition after she produced her business ledger Plaintiff testified that her ledger was the most accurate way to calculate her actual monthly income. McKean Decl. II, Ex. J at 2. Plaintiff stated that determining how much less income she earned while she was injured was "a little tricky . . . because VA pays a lot more money per appraisal; so I can do very few appraisals and just do a few of VA, and I still make as much money if I worked for other companies that pay[] me . . . less for an appraisal. . . . [E]very company pays me different." McKean Decl. I, Ex. A at 5. In addition, she does not get paid the same day that she does an appraisal, and the payment times vary. *Id.,* Ex. A at 8. As a result, to accurately figure out "how much money [Plaintiff] made in any given time period," one would have to review Plaintiff's business ledger. In fact, in her Response, Plaintiff uses the income figures taken from her business ledger in her calculations of the amount of income continuation expenses benefits that she asserts she is due rather than the income figures she used in the profit and loss statements that she provided to Defendant during the claims adjustment process. *Compare* Pl.'s Response at 20 and Lattin Decl., Ex 13 (revenue for August 2021 of $7,440) *with* Lattin Decl., Ex. 14 at 3 (income for August 2021 of $3,715).

Finally, Defendant notes that the ledger demonstrates that the number of appraisal jobs that Plaintiff performed per month and that the amount of income she earned per month varied significantly throughout the relevant period. For example, in September 2021 Plaintiff

performed 11 inspections and in November 2021 she performed only one. McKean Decl. I, Ex. D at 2. Conversely, Plaintiff had income of $4,465.71 in November 2021 and $969.21 in September 2021. *Id.* The average income approach that Plaintiff suggests Defendant should have continued to use even after it received her business ledger fails to account for these wide variations in the amount of work performed by Plaintiff each month and the amount of income Plaintiff received each month.

The Court concludes that Defendant has established that the provisions of the policy and the record support use of Defendant's method of calculating Plaintiff's income continuation expense benefits based on Plaintiff's monthly income found in her business ledger. Defendant has also established that using this method Plaintiff was entitled to $26,132.07 in income continuation expense benefits and that Defendant has fully paid Plaintiff that amount. Accordingly, the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's claim for breach of contract.

## III.    Breach of Implied Covenant of Good Faith

In her second claim Plaintiff alleges that "[a]s a direct and foreseeable result of [Defendant's] breach of its duty of good faith and fair dealing, plaintiff has suffered additional and unnecessary non-economic damages." Compl. ¶ 17. Defendant moves for summary judgment on this claim on the basis that Plaintiff seeks only noneconomic damages for that claim and under Oregon law Plaintiff cannot recover noneconomic damages for breach of the implied covenant of good faith.

Under Oregon law every contract has an implied covenant of good faith and fair dealing. *See, e.g., Zygar v. Johnson*, 169 Or. App. 638, 645 (2000)("Every contract contains an implied covenant of good faith and fair dealing, one that serves to protect the objectively reasonable

contractual expectations of the parties."). "Significantly, however, that implied covenant cannot contradict an express contractual term, nor otherwise provide a remedy for an . . . act that is permitted expressly by the contract." *Id.* (citation omitted). *See also Morrow v. Red Shield Ins. Co.*, 212 Or. App. 653, 661-62 (2007)("The law imposes a duty of good faith and fair dealing to facilitate performance and enforcement of the contract when it is consistent with and in furtherance of the agreed-upon terms of the contract, or where it effectuates the parties' objectively reasonable expectations under the contract."). Because the Court has concluded that Defendant did not breach the insurance contract in its payment of PIP benefits, the Court also concludes Defendant did not breach the implied duty of good faith and fair dealing. *See, e.g., Ramos v. Wells Fargo Bank N.A.*, No. 6:12-CV-00246-AA, 2012 WL 4863708, at *5 (D. Or. Oct. 5, 2012)(Noting the covenant of good faith and fair "cannot . . . provide a remedy for an act . . . that is expressly permitted by the terms of the contract, " and, therefore, the defendants' enforcement of the terms of the loan contract on plaintiffs' material default was "not actionable.")(quotation omitted)); *Uptown Heights Assocs. Ltd. P'ship v. Seafirst Corp.*, 320 Or. 638, 645 (1995)("The party invoking its express, written contractual right does not, merely by so doing, violate its duty of good faith").

Even if Plaintiff could bring a claim for the breach of the duty of good faith and fair dealing, as noted, Plaintiff seeks only noneconomic damages for that claim. Defendant points out that in *Keltner v. Washington County.*, 100 Or. App. 27 (1990), the Oregon Court of Appeals stated it was "bound by the holding of *Farris v. U.S. Fid. and Guar. Co.,* 284 Or. 453 (1978), that emotional distress damages are not recoverable in a contract action." *Id*. at 30. The Oregon Supreme Court affirmed that holding and declined to "reconsider the general rule of law in Oregon that a plaintiff in an action for breach of contract may not recover damages for purely

mental distress." *Keltner v. Wa. Cnty.*, 310 Or. 499, 502 (1990). The Court noted that in *Farris* it had reversed an award to the plaintiff of contract damages for mental distress explaining:

> "the defendant's failure to undertake representation of plaintiffs . . . could only have been a breach of contract, and, *in cases of breach, the law is clear that no recovery for mental distress because of threat of pecuniary loss is recoverable.*
>
> Plaintiffs argue that one who enters into a contract of insurance does so to guarantee himself peace of mind in case an action or claim is made against him. . . . The argument does not furnish a logical basis for recovery for emotional distress because many contracts for services, materials or financial assistance, as well as insurance contracts, are similarly made for economic and financial peace of mind."

*Id.* at 507-08 (quoting *Farris,* 284 Or. at 464–65)(emphasis in *Keltner*).

Plaintiff concedes that "ordinarily, emotional distress caused by pecuniary loss resulting from a breach of contract is not recoverable." *McKenzie v. Pac. Health & Life Ins. Co.*, 118 Or. App. 377, 381 (1993)(citing *Farris,* 284 Or. 456). Plaintiff asserts, however, that *McKenzie* created a narrow exception to *Farris* and that Plaintiff satisfies the criteria of that exception permitting her to recover emotional-distress damages for her breach of contract claim.

In *McKenzie* the defendant issued a policy to the plaintiff that insured him against major medical expenses up to $1 million. The plaintiff developed aseptic necrosis in both hips. The plaintiff advised the defendant that he would need surgery to treat his aseptic necrosis, but the defendant denied coverage. 118 Or. App. at 379. The plaintiff brought an action alleging the defendant refused to authorize surgery for the plaintiff's condition "without investigation of any kind and specifically in contradiction to the medical advice received by plaintiff's physician." *Id.* The plaintiff asserted a claim for breach of the implied covenant of good faith and fair dealing in which he alleged the defendant's breach "caused plaintiff . . . bodily harm" and "[a]s a result of defendant's breach, plaintiff . . . has suffered bodily harm and emotional distress." *Id.* at 380.

The defendant moved to strike plaintiff's allegations that the defendant's breach caused the plaintiff to suffer bodily harm and emotional distress. The trial court granted the defendant's motion. The Oregon Court of Appeals reversed acknowledging that "[o]rdinarily, emotional distress caused by pecuniary loss resulting from a breach of contract is not recoverable." *Id.* (citing *Farris,* 284 Or. at 456). The court, however, noted that "[w]hen . . . the emotional distress is caused by physical harm that results from the breach of contract, the case is different" and emotional distress damages may be allowed. *Id.* (citing *Coffey v. Northwestern Hospital Assn.,* 96 Or. 100, 115 (1919); *Keltner,* 310 Or. at 506). Plaintiff here asserts that because she has alleged that she suffered headaches and physical tension as a result of the way Defendant handled her claim, her claim is similar to that in *McKenzie* and she has sufficiently established she may claim emotional distress damages for her breach of contract claim.

Defendant asserts *McKenzie* is an Oregon Court of Appeals decision, accordingly, to the extent it contradicts or expands an exception to the Oregon Supreme Court's holding in *Farris,* the Oregon Supreme Court's decision in *Farris* governs. In addition, even if *McKenzie* is permissible, it is distinguishable. Specifically, in *McKenzie* the plaintiff's health insurance company refused to pay for the plaintiff's surgery and as a result the plaintiff experienced physical injury due to the delay in his ability to receive surgery for his aseptic necrosis. The Court of Appeals specifically noted emotional-distress damages may be allowed when the emotional distress is *caused by* the physical harm that results from breach of contract. Here, however, Plaintiff testified at deposition that she did not "suffer any physical injury as a result of the way [Defendant] handled [her] claim." McKean Decl., Ex. K at 3. Plaintiff, in fact, alleges the reverse of the plaintiff's allegations in *McKenzie*: Plaintiff's emotional distress from

Defendant's alleged breach caused her physical harm in the form of headaches and physical tension.

The Court need not determine whether *McKenzie* seeks to impermissibly expand or extend an exception in *Farris* or whether it contradicts *Farris* because the Court concludes even if *McKenzie's* holding is permissible, it does not apply here. The Court agrees with Defendant that Plaintiff alleges her emotional distress from Defendant's alleged breach of the duty of good faith and fair dealing caused her to suffer physical injuries, *i.e.,* headaches and physical tension, not that Defendant's alleged breach caused her physical injury that, in turn, caused her emotional distress. The Court, therefore, applies the "general rule of law in Oregon that a plaintiff in an action for breach of contract may not recover damages for purely mental distress." *Keltner*., 310 Or. 502. Accordingly, the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's claim for breach of the duty of good faith.

## IV. Negligent Infliction of Emotional Distress

In her claim for negligent infliction of emotional distress Plaintiff alleges a "special relationship was created between" the parties due to "the insurance contract entered into between plaintiff and defendant." Compl. ¶ 19. Plaintiff alleges that Defendant's "failure or refusal to resolve" Plaintiff's claim for income continuation expense benefits "violated duties that were implied under the parties' contract of insurance, as well expressly provided under applicable insurance codes." *Id.* ¶ 21. "In failing to abide by the terms of the insurance contract entered into with plaintiff defendant intended to inflict emotional distress, or alternatively knew, or should have known that emotional distress was substantially certain to result from defendant's conduct." *Id.* ¶ 22. As a result of Defendant's alleged failure to pay Plaintiff's income continuation expense benefits "as was required under both the parties' insurance contract, as well as was mandated

under the Oregon Insurance Code, plaintiff suffered emotional distress including anxiety, disappointment, grief and worry." *Id.* ¶ 23. Plaintiff seeks noneconomic damages.

It is not entirely clear from Plaintiff's Complaint whether Plaintiff intends to assert a claim for negligence based on Plaintiff's relationship with Defendant or a claim for negligence *per se* based on Defendant's alleged violation of Or. Rev. Stat. § 746.230. In any event Defendant asserts in its Motion for Summary Judgment that Plaintiff's claim for negligent infliction of emotional distress whether brought as a claim for negligence or negligence *per se*, fails as a matter of law because the Oregon Supreme Court has "consistently . . . rejected claims for emotional distress caused by a defendant's negligence, in the absence of any physical injury." *Paul v. Providence Health Sys.-Or.*, 351 Or. 587, 597 (2012)(citing *Hammond v. Central Lane Communications Ctr*, 312 Or. 17, 23 (1991)).

"Under Oregon law, a plaintiff who has suffered emotional distress as a result of a defendant's negligence ordinarily may not recover damages for such emotional harm in the absence of some sort of physical impact." *I. K. v. Banana Republic, LLC*, 317 Or. App. 249, 254 (2022)(citing *Norwest v. Presbyterian Intercommunity Hosp.*, 293 Or. 543, 558-61 (1982)). "There is an exception to that general rule when the defendant violated a 'legally protected interest' independent of the plaintiff's interest in being free from negligent conduct." *Id.* (citing *Norwest*, 293 Or. at 559). In *Philibert v. Kluser*, 360 Or. 698 (2016), the Oregon Supreme Court held that a "legally protected interest" in the context of a claim for negligent infliction of emotional distress is "an independent basis of liability separate from the general duty to avoid foreseeable risk of harm." *Id.* at 704. The court added, however, that to support a claim for negligent infliction of emotional distress the legally protected interest must be "of sufficient importance as a matter of public policy to merit protection from emotional impact." *Id.* at 705.

For example, although the law recognizes a right of privacy, the invasion of that right will not always support a claim for emotional distress, "because the nature and context of the invasion influences the extent to which privacy is legally protected and can be the basis for a successful emotional distress claim." *Id.* In addition, the emotional distress must have been a foreseeable result of violation of the legally protected interest. *Id. See also Shin v. Sunriver Preparatory Sch., Inc.*, 199 Or. App. 352, 365 (2005)(explaining that the exception applies only when "liability for negligence [has] a legal source that goes beyond the common-law duty to exercise reasonable care to prevent foreseeable harm" and "the legally protected interest so identified [is] of sufficient importance to warrant the award of damages for emotional distress."); *Tovar v. United States*, No. 3:21-CV-01794-HZ, 2022 WL 1125657, at *4 (D. Or. Apr. 15, 2022)(citing *Lowe v. Philip Morris USA, Inc.*, 207 Or. App. 532, 545 (2006))("In other words, if a party has assumed a heightened duty of care, [the court must determine whether] . . . that heightened duty "include[] a specific duty to avoid the infliction of emotional distress.").

> The analysis of a claim for negligent infliction of emotional distress thus proceeds in three steps: First, [the court] must determine whether the complaint alleges the violation of a legally protected interest. Second, [the court] must determine whether such interest is of sufficient importance as a matter of public policy to merit protection from emotional impact. And third, [the court] must determine whether the complaint alleges that the emotional distress was the foreseeable result of the violation of the legally protected interest.[5]

*I. K.*, 317 Or. App. at 255.

## A.    Legally Protected Interest

Defendant asserts insurance contracts do not create a special relationship between an insurer and an insured sufficient to establish an independent basis of liability separate from

---

[5] Because the Court concludes Plaintiff fails to establish the first two steps, the Court does not address the third step.

the general duty to avoid foreseeable risk of harm and, therefore, they do not support emotional distress damages. The Court agrees. In *Shin* the court noted that if an insurer undertakes to defend its insured against a third-party claim, the carrier assumes control of the defense and settlement negotiations and therefore stands in a special relationship with the insured. *Id.* at 366 (citing *Georgetown Realty v. The Home Insurance Company*, 313 Or. 97, 110-11 (1992)). When, however, "the insurer does not undertake the defense of the insured, the carrier does not assume the fiduciary duty that would result from having done so, and its responsibilities are confined to the contract terms." *Id.* (citing *Farris*, 284 Or. at 460; *Warren v. Farmers Ins. Co. of Or.*, 115 Or. App. 319, 324–25 (1992)).

In her Response Plaintiff appears to concede that the insurance contract in this case does not create a special relationship between Plaintiff and Defendant sufficient to give rise to a legally protected interest. Plaintiff, however, asserts Oregon Revised Statute § 746.230 and the Oregon Court of Appeals' decision in *Moody v. Oregon Community Credit Union,* 317 Or. App. 233 (2022), provide an independent standard of care that qualifies "as a legal source that goes beyond the common-law duty to exercise reasonable care to prevent foreseeable harm."

Although Plaintiff did not specifically set out provisions of Or. Rev. Stat. § 746.230 that she asserts create the required standard of care, in her Response Plaintiff asserts the following provisions of that statute apply to provide an independent duty of care:

> (1) An insurer or other person may not commit or perform any of the following unfair claim settlement practices:

> * * *

> (c) Failing to adopt and implement reasonable standards for the prompt investigation of claims;

> (d) Refusing to pay claims without conducting a reasonable investigation based on all available information;

* * *

(f) Not attempting, in good faith, to promptly and equitably settle claims in which liability has become reasonably clear;

(g) Compelling claimants to initiate litigation to recover amounts due by offering substantially less than amounts ultimately recovered in actions brought by such claimants;

* * *

(l) Failing to promptly settle claims under one coverage of a policy where liability has become reasonably clear in order to influence settlements under other coverages of the policy.

Defendant asserts in its Reply that the Oregon Supreme Court's decision in *Farris* forecloses Plaintiff's argument because in that case the Court made clear that emotional distress damages that result from an insurer's claim handling practices are not the kind of harm that § 746.230 was enacted to prevent.

The Oregon Supreme Court held in *Farris* that Or. Rev. Stat. § 746.230 does not permit recovery of emotional distress damages. The Court explained "[i]t is evident from [§ 746.230] that it was the intention of the legislature to prohibit insurance companies from intentionally breaching their contract to settle their insureds' claims . . . and to inflict certain consequences for so doing." *Farris*, 284 Or. at 458. "Because [§ 746.230] . . . provide[s] for the payment of damages not usually recoverable in such a situation, it would appear that had the legislature intended to enlarge the damages further [to include emotional distress damages], it would have so provided." *Id.* The Court concluded "[i]t was certainly not intended by the legislature that additional pressure to perform the contract be exerted by allowing the recovery of damages for emotional distress since the statute provides for civil damages recoverable by the state for that purpose." *Id.* Indeed, "[t]here is nothing to indicate that the legislature intended,

when it prohibited certain claims settlement practices in ORS 746.230, that actions for breach of insurance contracts would be transformed, in all of the covered instances, into tort actions with a resulting change in the measure of damages." *Id.* In addition, Or. Rev. Stat. § 746.230 "express[es] no public policy which would promote damages for emotional distress. Concern about the insured's peace of mind does not appear to be the gravamen of the statutory policy." *Id.*

Plaintiff asserts *Farris* does not apply because she "does not invoke Defendant's violation of ORS 746.230 as a cause of action, in an of itself," rather she relies on the statute only to determine that claim's "standard of care" element for her common law claim of negligence. Pl.'s Resp. at 10. Courts, however, have found such a claim is not actionable whether framed as a claim for violation of the statute, for negligence, or for negligence *per se*. For example, in *Braun-Salinas v. Am. Family Insurance Group,* the plaintiffs asserted that Oregon has recognized negligence *per se* claims based on an insurer's failure to pay insurance benefits in violation of the standard of care set forth in Oregon Revised Statute § 746.230. 665 F. App'x 576, 577 (9th Cir. 2016). The Ninth Circuit noted that "[t]he Oregon Court of Appeals has rejected a statutory theory, holding that a violation of [§ 746.230] 'does not give rise to a tort action.'" *Id.* at 578 (quoting *Emp'rs Fire Ins. Co. v. Love It Ice Cream Co*., 64 Or. App. 784 (1983)(rejecting bad faith claim for refusal to pay fire insurance benefits in violation of ORS 746.230) and citing *Richardson v. Guardian Life Ins. Co. of Am.,* 161 Or. App. 615 (1999)(rejecting bad faith claim for refusal to pay disability insurance benefits in violation of ORS 746.230 because such a violation was "not independently actionable")). The plaintiffs asserted that *Love It Ice Cream* and *Richardson* barred "a *statutory* claim - meaning a private right of action created by statute - whereas the [plaintiffs brought] a *common law* claim for negligence *per se* that relies on the statute only to determine that claim's "standard of care"

element." *Id.* (emphasis in original). The Ninth Circuit found the plaintiffs' argument
"unpersuasive because the Oregon Court of Appeals has also declined to recognize a common
law negligence claim for failure to pay first-party insurance benefits." *Id.* (citing *Strader v.
Grange Mut. Ins. Co.*, 179 Or. App. 329 (2002)). For the reasons set out in *Braun-Salinas*, this
Court finds Plaintiff's assertion that she "does not invoke Defendant's violation of ORS 746.230
as a cause of action, in an of itself," rather she relies on the statute only to determine that claim's
"standard of care" element for her common law claim of negligence is unavailing. Oregon courts
have concluded that emotional distress damages are not available for violations of § 746.230 or
for common law negligence claims resting on that statute.

Plaintiff also relies on *Abraham v. T. Henry Constr., Inc.*, 230 Or. App. 564
(2009) in which the Oregon Court of Appeals recognized a negligence *per se* claim based on
violations of the building code. "In the insurance context, however, Oregon courts have declined
to recognize a claim based on failure to pay first-party insurance benefits under both a statutory
and common law negligence theory," therefore, this case is in applicable under the circumstances
here. *Braun-Salinas*, 665 F. App'x 578.

Finally, Plaintiff asserts the Oregon Court of Appeals recently found that a claim
for negligence *per se* based on violation of § 746.230 was permitted under Oregon law in *Moody
v. Oregon Community Credit Union,* 317 Or. App. 233 (2022). The defendants in *Moody*
asserted that even if a plaintiff may state a claim for negligence *per se* based solely on the
violation of a statute, plaintiff in that case could not do so because the Supreme Court
determined in *Farris* that ORS 746.230(1) does not provide a cause of action for damages. *Id.* at
243. The Oregon Court of Appeals concluded that *Farris* did not answer the inquiry because its
statement that "[t]here is nothing to indicate that the legislature intended, when it prohibited

certain claims settlement practices in ORS 746.230, that actions for breach of insurance contracts would be transformed, in all of the covered instances, into tort actions with a resulting change in the measure of damages" was *dictum*, and, therefore, "has no particular precedential force." *Id.* at 243–44, 245.[6] The court also stated the issue in *Farris* was different from that in *Moody* because *Farris* involved whether the legislature intended to create a statutory cause of action, *Moody* involved whether the violation of a statute may support a negligence *per se* claim. *Id.* at 246. "The fact that the legislature may not have intended to create a private right of action for recovery of emotional distress damages does not necessarily mean that the legislature did not enact ORS 746.230, at least in part, to prevent such emotional distress from occurring." *Id.* Ultimately, the Court of Appeals concluded the trial court erred when it dismissed the plaintiff's claim for negligence *per se* and struck her allegation of emotional distress damages. The court explained.

> [t]he legislature may well have declined to provide a private right of action for damages when it enacted ORS 746.230. But, . . . given that the very nature of insurance is that it is purchased to ensure peace of mind, it is hard to imagine that the legislature did not intend the law . . . to prevent policyholders from being forced to experience the stress of dealing with unfair insurance claim settlement practices.

*Id.* at 248.

Defendant points out that judges in this Court have "declined to follow *Moody*, concluding it does not align with the Oregon Supreme Court opinion in *Farris*." *Leonard v.*

---

[6] The court noted, however, that it "appear[s] to have endorsed th[e] assumption" that the holding in *Farris* made clear that violation of § 746.230 does not give rise to a negligence claim. *Id.* at 244 n.2 (citing *Richardson v. Guardian Life Ins. Co.*, 161 Or. App. 615, 623-24 (1999) (violations of ORS 746.230 "are not independently actionable," citing *Farris*); *Love It Ice Cream*, 64 Or. App. 784, 790, 670 P.2d 160 (1983)(violation of ORS 746.230 "does not give rise to a tort action," citing *Farris*). The court, nevertheless, reached the opposite conclusion in *Moody*.

*Scottsdale Ins. Co.*, No. 6:22-CV-01764-MC, 2023 WL 2968624, at *2 (D. Or. Apr. 17, 2023).

*See also Koa v. Allstate Indem. Co.*, No. 1:22-CV-00658-CL, 2023 WL 3066268, at *1 (D. Or. Mar. 23, 2023)(declining to adopt magistrate judge's recommendation to follow *Moody*); *White v. United Heritage Prop. & Cas. Co.*, No. 3:21-CV-01524-JR, 2023 WL 2611152, at *1 (D. Or. Mar. 23, 2023)("The Court finds that the ruling by Oregon Court of Appeals in *Moody* [ ] has not definitively changed Oregon law to allow a plaintiff to bring a negligence *per se* claim against an insurer for impermissible claim settlement practices in violation of O.R.S. 746.230. Additionally, because Plaintiff cannot recover either emotional distress damages or punitive damages, his negligence *per se* claim fails.").

In any event, federal courts sitting in diversity apply "'the substantive law of the state.'" *Clark v. Eddie Bauer LLC*, 30 F.4th 1151, 1154 (9th Cir. 2022) (quoting *Albano v. Shea Homes Ltd. P'ship*, 634 F.3d 524, 530 (9th Cir. 2011)). When "determining the law of the state for purposes of diversity, a federal court is bound by the decisions of the highest state court." *Id.* (quotation omitted). "In the absence of such a decision, a federal court must predict how the highest state court would decide the issue." *In re Kirkland*, 915 F.2d 1236, 1239 (9th Cir. 1990). The Court notes that although *Moody* found the Oregon Supreme Court's decision in *Farris* was *dictum*, the Oregon Court of Appeals itself has not consistently reached that same conclusion. *See e.g., Richardson,* 161 Or. App. at 623-24 (violations of ORS 746.230 "are not independently actionable," citing *Farris*); *Love It Ice Cream*, 64 Or. App. at 790 (violation of ORS 746.230 "does not give rise to a tort action," citing *Farris*). In addition, this Court concludes *Farris* provides strong guidance as to how the Oregon Supreme Court would decide the issue. Accordingly, the Court concludes the Oregon Supreme Court would likely decide that § 746.230 does not permit recovery of emotional distress damages nor are emotional distress damages

permitted for a common law claim for negligence or a claim for negligence *per se* premised on an insurer's failure to satisfy § 746.230.

   The Court, therefore, concludes Plaintiff has not established a sufficient legally protected interest to support emotional distress damages for her negligence claim.

  **B.**  **Interest of Sufficient Importance**

   As noted, '"[n]ot just any legally protected interest warrants protection against emotional distress. The interest must be of sufficient importance as a matter of public policy." *I. K.*, 317 Or. App. at 261 (quotation omitted). "There appears to be no clear-cut test for determining whether a given interest is of sufficient importance. Primarily, it appears that courts compare the interest at issue with those that the courts have found to be of sufficient importance in other cases." *Id.* at 262.

   Defendant asserts the alleged invasion of the interest here was not of sufficient importance to warrant the award of damages for emotional distress. Defendant notes that Oregon courts "have held that, where the underlying loss is an economic or property loss that predictably also results in emotional distress, the invasion is not of sufficient importance to warrant an award of damages for emotional distress." *Shin*, 199 Or. App. at 371. For example, in *Collver v. Salem Ins. Agency, Inc.*, 132 Or. App. 52, 54-55 (1994), the court held that the loss of the plaintiff's driving privileges due to the allegedly negligent failure of his insurance broker and carriers to procure auto insurance coverage was not an invasion of sufficient importance to warrant an award of damages for emotional distress because the invaded interest was "chiefly an economic one." Similarly, in *McCulloch v. Price Waterhouse LLP*, 157 Or. App. 237, 251–52 (1998), the court held that the alleged infringement by the defendant accountants of the plaintiff's interest in trust assets and in having tax returns filed timely was not sufficient to support an award for

emotional distress. Defendant contends that unlike in *Shin*, Plaintiff here suffered emotional distress as a secondary consequence of an economic or property loss allegedly caused by Defendant's. The Court agrees and concludes, therefore, that Plaintiff has not established the alleged invasion of the interest here was of sufficient importance to warrant an award of damages for emotional distress.

In summary, the Court concludes Plaintiff fails to establish a claim for negligent infliction of emotional distress. The Court, therefore, grants Defendant's Motion for Summary Judgment as to that claim.

## CONCLUSION

The Court GRANTS Defendant The Standard Fire Insurance Company's Motion for Summary Judgment. ECF 24.

IT IS SO ORDERED.


DATED:_____October 3, 2023_____.



_____
MARCO A. HERNÁNDEZ
United States District Judge

Nordin v. The Standard Ins. Co.
3:22-cv-00775-HZ

| Month | Estimated Income | Actual Income | Difference | 70% of Lost Income | Greater than $3,000? | Loss Recoverable Under Policy | |
|---|---|---|---|---|---|---|---|
| May 2021 | $ 7,154.59 | $ 1,700.00 | $ 5,454.59 | $ 3,818.21 | yes | $ 3,000.00 | |
| June 2021 | $ 7,154.59 | $ 3,875.00 | $ 3,279.59 | $ 2,295.71 | no | $ 2,295.71 | |
| July 2021 | $ 7,154.59 | $ 3,925.00 | $ 3,229.59 | $ 2,260.71 | no | $ 2,260.71 | |
| August 2021 | $ 7,154.59 | $ 7,440.00 | $ (285.41) | N/A | no | 0 | |
| September 2021 | $ 7,154.59 | $ 5,770.00 | $ 1,384.59 | $ 969.21 | no | $ 969.21 | |
| October 2021 | $ 7,154.59 | $ 3,175.00 | $ 3,979.59 | $ 2,785.71 | no | $ 2,785.71 | |
| November 2021 | $ 7,154.59 | $ 775.00 | $ 6,379.59 | $ 4,465.71 | yes | $ 3,000.00 | |
| December 2021 | $ 7,154.59 | $ 1,785.00 | $ 5,369.59 | $ 3,758.71 | yes | $ 3,000.00 | |
| January 2022 | $ 7,154.59 | $ 1,550.00 | $ 5,604.59 | $ 3,923.21 | yes | $ 3,000.00 | |
| February 2022 | $ 7,154.59 | $ 3,125.00 | $ 4,029.59 | $ 2,820.71 | no | $ 2,820.71 | |
| March 2022 (D amt) | $ 7,154.59 | $ 2,350.00 | $ 4,804.59 | $ 3,363.21 | yes | $ 3,000.00 | |
| | | | | | | | |
| March 2022 (P amt) | $ 7,154.59 | $ 1,225.00 | $ 5,929.59 | $ 4,150.71 | yes | $ 3,000.00 | alternative calculation |

Total    $    26,132.07

EXHIBIT 1

**Plaintiff's Method**

| | 2020 actual income | projected annual income | Actual annual income | difference in projected and actual | difference prorated over 47 weeks | weekly shortfall x4 | 70% of weekly |
|---|---|---|---|---|---|---|---|
| Income | $ 85,855.00 | $ 85,855.00 | | | | | |
| weeks earned during yr | 52 | 52 | | | | | |
| average weekly income | $ 1,651.06 | $ 1,651.06 | | | | | |
| number of weeks | 52 | 47 | | | | | |
| prorated weekly income | $ 85,855.00 | $ 77,599.71 | | | | | |
| | | | $ 25,416.10 | | | | |
| | | | | $ 52,183.61 | | | |
| weekly shortfall | | | | | $ 1,110.29 | | |
| monthly shortfall | | | | | | $ 4,441.16 | |
| 70% of monthly shortfall | | | | | | | $ 3,108.81 |

**11 months of income continuation expense benefits**     **$ 33,000.00**

**(limited to $3,000 per month)**

**EXHIBIT 2**